**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER CRANDALL,

      Plaintiff,                                 Case No. 09-12677

v.                                            Hon. Gerald E. Rosen

GENESEE COUNTY, SGT. COON,
OFC. LYNCH, AMY YORK, KYLE GUEST,
D. BAYLOCK, DAVID SCHMEIDER,
STEPHANIE NELSON, D. HASKINS,
G. GATICA, MICHAEL IGNASH, RODNEY
HUNT, and MEOCHY PROBY,

      Defendants.
_____/

**OPINION AND ORDER REGARDING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____June 21, 2012_____

PRESENT:  Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I.  INTRODUCTION

In this case, Plaintiff Jennifer Crandall has asserted federal and state-law claims

against Defendant Genesee County and a number of law enforcement officers employed

by the Defendant County, arising from the Defendant officers' alleged use of excessive

force against Plaintiff while she was detained at the Genesee County Jail for a two-day

period in July of 2007.  This Court's subject matter jurisdiction rests upon Plaintiff's

assertion of claims under 42 U.S.C. § 1983 alleging violations of her rights under the U.S. Constitution.  *See* 28 U.S.C. § 1331.

Through the present motion, the Defendant law enforcement officers and Genesee County seek an award of summary judgment in their favor on each of the claims asserted against them in Plaintiff's complaint.  In support of this motion, Defendants argue (i) that there is no evidence that certain of the officers named as Defendants in the complaint were involved in any way in the incidents giving rise to Plaintiff's claims; (ii) that the degree of force used against Plaintiff during her detention at the Genesee County Jail was appropriate as a matter of law, in light of Plaintiff's own actions that necessitated this use of force; (iii) that Plaintiff has failed to plead viable state-law claims of gross negligence against the individual Defendants; and (iv) that Plaintiff has failed to identify a policy or custom of the Defendant County that was the moving force behind any alleged violation of her federal constitutional rights.

Defendants' motion has been fully briefed by the parties.  Having reviewed the parties' briefs and their accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on this motion.

## II.  FACTUAL BACKGROUND

2

At around 2:00 p.m. on July 12, 2007, Plaintiff Jennifer Crandall was arrested by officers of the City of Burton, Michigan police department on a domestic assault charge and taken to the Genesee County Jail. This stay lasted until around 11:00 p.m. the following day, July 13, 2007, when officers from the City of Roseville, Michigan took custody of Plaintiff on an outstanding arrest warrant. During the course of this approximately 33-hour stay at the Genesee County Jail, there were three instances in which Plaintiff was placed in a restraint chair, a restraint bed, or both.

Upon her arrival at the Genesee County Jail on July 12, 2007, Plaintiff initially was placed in a general population holding cell. At around 6:00 p.m. that evening, however, Plaintiff was moved into a single-person isolation or "safety" cell, allegedly for engaging in disruptive behavior. (*See* Defendants' Motion, Ex. 1, Incident Report and Safety Cell Placement Form.) While in this single-person cell, Plaintiff complained of being cold and requested a blanket, and she also sought medical attention for an anxiety attack. When the deputies in the area failed to address these complaints, Plaintiff began knocking or banging on the cell door to get the officers' attention. According to an incident report prepared by one of the deputies, Defendant Amy Yorke,[1] Plaintiff was warned to stop banging on the cell door, but she continued to do so. (*See id.*) Accordingly, at around 6:20 p.m., Plaintiff was placed in a restraint chair. About ten

---

[1]Deputy Yorke was misnamed in Plaintiff's complaint as Amy York. In addition, by the time of her deposition in this case, Ms. Yorke evidently had gotten married, and she now goes by the name of Amy Gatica.

3

minutes later, a nurse checked the straps being used to hold Plaintiff in the restraint chair and found that they were OK, and Plaintiff remained in this chair for about two hours before being released and returned to the general population holding cell.  (*See id.*)

At around 11:50 a.m. the following morning, July 13, 2007, Plaintiff was placed in a single-person safety cell for a second time, after she allegedly knocked repeatedly on a window in the general holding cell.  (*See* Defendants' Motion, Ex. 3, Incident Report.) According to an incident report prepared by one of the Defendant officers, Deputy Darious Baylock, Plaintiff began yelling out of her isolation cell and banging on the door, and she continued this disruptive behavior despite attempts by the deputies and by Sergeant David Schmieder (also named as a Defendant) to speak to her and get her to stop.  (*See id.*)[2]  Plaintiff also covered up a camera in the safety cell.  Based on this purportedly disruptive behavior, Plaintiff was again placed in a restraint chair, with a nurse again checking the restraining straps.  (*See id.*)  According to Plaintiff, in the course of placing her in the restraint chair, one of the deputies grabbed her by the throat or neck and slammed her into the wall, and a number of deputies "physically grabbed me and threw me into the chair."  (Plaintiff's 3/25/2010 Dep. at 134, 137; Plaintiff's 3/31/2010 Dep. at 134, 142-44.)

After Plaintiff was placed in a restraint chair for a second time, she complained that her hands were strapped in so tightly that she was losing circulation, but a nurse

---

[2]Although the complaint identifies this officer as "David Schmieder," his incident report reflects that the correct spelling of his last name is "Schmieder."  (*See id.)*

4

found no problems with the restraining straps.  (*See* Plaintiff's 3/25/2010 Dep. at 136-38.)

In an effort to ease the pain from the straps, Plaintiff worked her right arm loose from the

restraint chair.  (*See id.*)  In response, Sergeant Schmieder determined that Plaintiff

should be placed in a restraint bed.  (*See* Defendants' Motion, Ex. 3, Incident Report.)

According to Sergeant Schmieder's report, force had to be used to put Plaintiff in the

restraint bed "due to her resisting."  (*Id.*)  In addition, Sergeant Schmieder reported that

Plaintiff "began banging her head" against the bed, "causing a small laceration to her

forehead," and it was determined that a safety helmet should be placed on Plaintiff's

head.  (*Id.*)  After about two hours, Plaintiff was removed from the restraint bed and

returned to a safety cell.

Later that evening, at approximately 8:30 p.m., Plaintiff was again moved into a

safety cell for "insolent and uncooperative" behavior.  (*See* Defendants' Motion, Ex. 5,

Incident Reports.)  According to the reports of Deputy Stephanie Nelson, Deputy

Guadalupe Gatica, and Sergeant Michael Ignash — each of whom has been named a

Defendant in this action — Plaintiff continued her disruptive behavior while in the

isolation cell, yelling and banging on the cell door despite being told several times to

stop.  (*See id.*)  Accordingly, it was again determined that Plaintiff should be placed in a

restraint bed, with Sergeant Ignash, Sergeant Schmieder, Deputy Gatica, Deputy Nelson,

and Deputy (and co-Defendant) Duane Haskins all participating in this effort.  (*See id.*)

The Defendant officers reported that Plaintiff disregarded their commands to lie down on

the restraint bed, and instead resisted their attempts to place her in the bed by turning on

5

her side, attempting to get up, swinging her arm, pushing, and kicking.  (*See id.*)  Based on this continued resistance, Sergeant Ignash administered a "1-2 second spray of O.C. spray" (*i.e.,* pepper spray), and the Defendant officers then were able to complete the process of placing Plaintiff in the restraint bed.  (*Id.*)  Within a short time, Plaintiff was checked by a nurse, taken to a shower, given a change of clothes, and returned to a safety cell, (*see id.*), where she was held until being transferred to the custody of the Roseville police at around 11:00 p.m. that night.

Plaintiff has offered a rather different account of this incident in which she was placed in a restraint bed and sprayed with OC spray.  According to Plaintiff's deposition testimony, the Defendant officers called her a "f*ck boy" and a "dyke" as they placed her in the restraint bed, and they pushed their knees down into her back and shoulder and "physically pick[ed] me up and forc[ed] me onto the bed."  (Plaintiff's 3/31/2010 Dep. at 116-18.)  When Plaintiff asked the officers to avoid pulling on or otherwise harming her dislocated left shoulder, they nonetheless "continued to put pressure onto my left arm" by placing their knees on her back and shoulder, resulting in her body being "slammed up against the bed" and her head "bouncing off of" the restraint bed "at least six times," and leading to contusions on her head.  (*Id.* at 117-19.)  Plaintiff further testified that when the OC spray was administered, it was held only "2 1/2 inches away from my eye" and sprayed "directly into my left eye."  (*Id.* at 119.)

After this use of OC spray, the Defendant officers continued the process of strapping Plaintiff face down in the restraint bed with her face lying "in a pool of Mace,"

6

leaving her with burning eyes, difficulty breathing, and vomiting "due to the inhalation of the Mace in my mouth." (*Id.* at 120, 122.)  The Defendant officers initially ignored Plaintiff's distress and pleas for medical assistance, but a female deputy (apparently Deputy Nelson) eventually led her to a shower and told her that she would be given two minutes to rinse the OC spray out of her eyes.  (*See id.* at 120-24.)  Part of this limited opportunity for showering, however, was spent with Plaintiff groping to find the shower faucets in light of the OC spray in her eyes, with the female deputy subjecting Plaintiff to a "hot and cold game[]," telling her that she was "getting warmer or colder" rather than simply leading Plaintiff directly to the faucets and turning on the water for her.  (*Id.* at 124-25.)  When Plaintiff asked for more time to wash the OC spray from her eyes, the deputy refused this request and led Plaintiff back to an isolation cell, with her eyes still burning from the spray.  (*Id.* at 125-27.)  In an effort to alleviate this burning, Plaintiff stuck her head in the cell toilet.  (*See id.* at 127.)

Although Plaintiff was able to recall various details of this incident on the evening of July 13 when she was sprayed with OC spray and strapped to a restraint bed, her testimony as to the events that preceded this incident is much more limited.  Plaintiff testified, for example, that she recalled only one of the two occasions when she was placed in a restraint chair.  (*See* Plaintiff's 3/25/2010 Dep. at 134-35.)[3]  Likewise,

---

[3]The parties agree that Plaintiff's deposition testimony references only the second time she was placed in a restraint chair — *i.e.,* the incident that occurred at around noon on July 13. (*See* Defendants' Motion, Br. in Support at 4; Plaintiff's Response Br. at 2 & n.1.)  Although the incident reports generated by the Defendant officers refer to an earlier occasion on the evening of July 12 when Plaintiff was placed in a restraint chair, (*see* Defendants' Motion, Ex. 1),

7

Plaintiff remembered being placed in a restraint bed only one time.  (*See* Plaintiff's

3/25/2010 Dep. at 135.)[4]  More generally, Plaintiff was largely unable to identify or

describe the officers who subjected her to the mistreatment giving rise to her claims in

this case.  (*See, e.g.,* Plaintiff's 3/25/2010 Dep. at 137 (Plaintiff unable to identify

deputies who put her in restraint chair); Plaintiff's 3/31/2010 Dep. at 114 (Plaintiff unable

to describe the approximately six officers involved in placing her in restraint bed, except

that one was a female deputy).)[5]

---

Plaintiff could not recall this earlier incident, (*see* Plaintiff's 3/25/2010 Dep. at 134-35).

[4]From her testimony, it appears that Plaintiff might have recalled the two separate placements into a restraint bed as comprising a single incident.  She testified that she was placed into a restraint bed after she had worked her right arm loose from the restraint chair, and that OC spray was administered as she was being placed into the bed.  (*See id.* at 135-38.)  The reports prepared by the Defendant officers, however, indicate that these were two separate incidents.  According to these reports, Plaintiff was first placed into a restraint bed at around noon on July 13, after she worked her arm free from the restraint chair.  (*See* Defendants' Motion, Ex. 3.)  She then was returned to the restraint bed at around 8:30 that evening, with OC spray administered during this second placement.  (*See* Defendants' Motion, Ex. 5.)

[5]To the extent that Plaintiff did single out one particular officer in her deposition testimony, it appears that her identification of this officer was erroneous.  In particular, Plaintiff identified "Sergeant Coon" as an "African-American male" officer who grabbed her by the back of her neck, slammed her into the wall, grabbed her arm, and threw her into the restraint chair. (Plaintiff's 3/25/2010 Dep. at 142-44; *see also* Plaintiff's 3/31/2010 Dep. at 143-45.)  Yet, as Defendants point out, Defendant Joseph Coon is a white male, and he was a lieutenant at the time of the incidents giving rise to this suit.  In addition, Defendant Coon has testified that he was not working on the dates in question, and that he had no contact with Plaintiff during her stay at the Genesee County Jail.  (*See* Defendants' Motion, Ex. 9, Coon Dep. at 23-24, 33.) Finally, Defendants state without contradiction that each sergeant named as a Defendant is a white male.  In light of this record, Plaintiff acknowledges that "it [is] possible" that her reference to "Sergeant Coon" at her deposition was mistaken, and she suggests that she instead meant to refer to Deputy (not Sergeant) Darious Baylock.  (Plaintiff's Response Br. at 6 n.2.)

# III.  ANALYSIS

### A.    The Standards Governing Defendants' Motion

Through the present motion, the twelve Defendant law enforcement officers and their employer, Defendant Genesee County, seek an award of summary judgment in their favor on Plaintiff's federal claims under 42 U.S.C. § 1983, as well as her state-law claims of assault and battery and gross negligence.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[6]  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences."  *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007).  Yet, the nonmoving party "may not rely merely on allegations

---

[6]Rule 56 has recently been revised in various respects, but the language quoted here (and immediately below) reflects the Rule as it read when Defendants filed their motion.  Under the current Rule, the bulk of the quoted language from subsection (c) has been moved to subsection (a), but the recent amendments do not appear to have altered the overarching standards for resolving a summary judgment motion.

or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party."  *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

## B.     Plaintiff Has Failed to Produce Any Evidence That Six of the Defendant Officers Were Involved in the Incidents Giving Rise to Her Claims.

In her first amended complaint, Plaintiff has identified twelve law enforcement officers as purported participants in the mistreatment she allegedly suffered during her 33-hour stay at the Genesee County Jail in mid-July of 2007.[7]  As their first argument advanced in the present motion, however, Defendants contend that the record fails as a matter of law to establish a factual basis for holding six of these twelve individual Defendants liable for any harm allegedly inflicted upon Plaintiff during this period of detention.  The Court agrees.

It is a well-established principle of federal § 1983 law that "[e]ach defendant's

---

[7]Plaintiff also named three nurses as Defendants in her first amended complaint, but the claims against these three individuals were dismissed by stipulated order dated May 21, 2010.

10

liability must be assessed individually based on his own actions." *Binay v. Bettendorf,*
601 F.3d 640, 650 (6th Cir. 2010). In the specific context of § 1983 claims of excessive
force, while a plaintiff need not show that each defendant officer "actively participated in
striking" her, an officer who has not directly inflicted harm may be held liable for
"fail[ing] to act to prevent the use of excessive force" by other officers only if "(1) the
officer observed or had reason to know that excessive force would be or was being used,
and (2) the officer had both the opportunity and the means to prevent the harm from
occurring." *Smoak v. Hall,* 460 F.3d 768, 784 (6th Cir. 2006) (internal quotation marks
and citation omitted). Similarly, under the state-law theories of recovery advanced in
Plaintiff's complaint, the imposition of liability against a given Defendant officer requires
a showing of this specific officer's involvement in the unlawful conduct that caused
injury to Plaintiff. *See, e.g., Garretson v. City of Madison Heights,* 407 F.3d 789, 801
(6th Cir. 2005) (holding that one of the defendant officers did not act in a manner deemed
grossly negligent under Michigan law, where he was unaware of the plaintiff's medical
condition or need for treatment); *Hammond v. Northwest Airlines,* No. 09-12331, 2010
WL 2836899, at *3 (E.D. Mich. July 19, 2010) (holding that a defendant flight attendant
could not be held liable for assault and battery, where there was no evidence that this
defendant "ever touched either plaintiff or put them in fear of a battery").

Applying these principles of individual liability to the facts of this case, it is clear
that Plaintiff has failed to identify a basis in the record for going forward with her claims
against Defendants Coon, Lynch, Yorke, Guest, Hunt, and Proby. Defendant Lynch

testified without contradiction that he had no contact whatsoever with Plaintiff. (*See* Defendants' Motion, Ex. 11, Lynch Dep. at 13, 15, 18.) Similarly, Defendant Proby testified that she had no physical contact with Plaintiff, and that the only time she recalled seeing Plaintiff was when she returned to the Genesee County Jail after the fact to complain of the incidents giving rise to this suit. (*See* Defendants' Motion, Ex. 4, Proby Dep. at 31.) Defendant Hunt's involvement was limited to his review, as a supervising officer, of certain of the incident reports prepared by the officers who interacted with Plaintiff, (*see* Defendants' Motion, Exs. 1, 5), and he testified that he was not directly involved with these incidents, could not say whether he was even in the vicinity of these incidents, and could not recall having seen Plaintiff during her stay at the jail, (*see* Defendants' Motion, Ex. 2, Hunt Dep. at 33; Plaintiff's Response, Ex. N, Hunt Dep. at 23).

Next, and as noted earlier, Defendant Coon testified without contradiction that he was not working on the two days in mid-July of 2007 when Plaintiff was held at the Genesee County Jail, and thus had no contact whatsoever with Plaintiff. (*See* Defendants' Motion, Ex. 9, Coon Dep. at 23-24, 33.) Finally, the only evidence of any interaction between Plaintiff and Defendants Yorke and Guest is with respect to the incident on the evening of July 12, 2007 when Plaintiff was placed in a restraint chair for the first time. (*See* Defendants' Motion, Ex. 1, 7/12/2007 Incident Report; *see also* Defendants' Reply, Ex. A, Cobb Aff. at ¶ 5 (stating that Defendant Guest did not work on July 13, 2007, and that Defendant Yorke was assigned that day to a floor different from

12

the one on which Plaintiff was held).)  Since Plaintiff does not recall this initial placement in a restraint chair, it follows that she cannot identify any mistreatment she suffered during this incident.

Plaintiff's efforts to avoid this outcome are unavailing, if not outright frivolous. With respect to Defendants Hunt and Proby, Plaintiff seizes upon their inability to rule out the possibility that they *might* have seen Plaintiff at some point while she was held at the jail, or that they (or Defendant Hunt, at least) *might* have been in the "general area" at the time of the incidents giving rise to this suit.  (*See* Plaintiff's Response Br. at 12.)  Yet, any purported "questions of fact," (*id.),* that might lurk within the deposition testimony of these two Defendants clearly are not material, where nothing in this testimony (or elsewhere in the record) could assist Plaintiff in making the necessary showing that either of these Defendant officers had "the opportunity and the means to prevent" the use of excessive force by their fellow officers.  *Smoak,* 460 F.3d at 784.  Still less is the Court able to perceive any genuine issue of material fact arising from the testimony of Defendant Lynch, who stated *without contradiction* that he had no contact whatsoever with Plaintiff.  It is well established that a properly supported summary judgment motion cannot be defeated by the mere prospect that a trier of fact might choose to disbelieve the moving party's evidence refuting a necessary element of the plaintiff's claim.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514 (1986).

Turning next to her claims against Defendant Coon, Plaintiff apparently suggests that an issue of fact arises from her testimony that "Sergeant Coon" used excessive force

13

when he grabbed her by the back of her neck, slammed her into the wall, grabbed her

arm, and threw her into the restraint chair.  (*See* Plaintiff's 3/25/2010 Dep. at 142-44;

Plaintiff's 3/31/2010 Dep. at 143-45.)  Plaintiff testified that her belief as to the identity

of this officer was based on her observation that he had sergeant stripes on his uniform

and the name "Coon" on his name tag, and she further recalled that he was African-

American.  (Plaintiff's 3/25/2010 Dep. at 142.)  Yet, because this testimony is "blatantly

contradicted by the record" — including the unrefuted evidence that Defendant Coon is

white, was a lieutenant at the time of Plaintiff's detention at the Genesee County Jail, and

did not work on the dates in question — the Court cannot "adopt [Plaintiff's] version of

the facts for purposes of a ruling on a motion for summary judgment."  *Scott v. Harris,*

550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007).  Indeed, in her response to Defendants'

motion, Plaintiff herself has conceded that her reference to "Sergeant Coon" at her

deposition evidently was mistaken, and that "it is possible" that she instead meant to refer

to Defendant Baylock.  (Plaintiff's Response Br. at 6 n.2.)  Under this record, a trier of

fact could not reasonably conclude that Defendant Coon had any involvement in the

incidents giving rise to this suit.

Finally, with regard to Defendants Yorke and Guest, Plaintiff cites nothing in the

record to contradict the evidence that these two officers were involved only in the first

placement of Plaintiff in a restraint chair on the evening of July 12, 2007.  Nor can

Plaintiff hope to overcome her own deposition testimony that she does not recall — and,

therefore, has no basis to challenge the legality of — this July 12 incident in which she

14

was placed in a restraint chair for the first time.  Accordingly, these two Defendants — as well as Defendants Coon, Lynch, Hunt, and Proby — are entitled to an award of summary judgment in their favor on the claims asserted against them in Plaintiff's first amended complaint.

**C.    Issues of Fact Remain as to Whether Plaintiff Was Subjected to Excessive Force in Violation of Her Fourteenth Amendment Rights as a Pretrial Detainee.**

In Count I of her first amended complaint, Plaintiff has asserted a federal § 1983 claim against the Defendant officers arising from their alleged use of excessive force against her during her 33-hour period of detention in the Genesee County Jail.  In their present motion, Defendants argue that this claim fails as a matter of law, where the degree of force used by the Defendant officers purportedly was justified by Plaintiff's acts of resistance to the officers' lawful commands and efforts to maintain prison discipline.  As discussed below, the Court finds that issues of fact preclude any resolution of this claim as a matter of law.

While "[p]risoners are protected from the use of excessive force by the Eighth Amendment," the rights of a pretrial detainee, such as Plaintiff here, "stem from the Due Process Clause of the Fourteenth Amendment, which protects a pretrial detainee from the use of excessive force that amounts to punishment."  *Griffin v. Hardrick,* 604 F.3d 949, 953 (6th Cir. 2010) (internal quotation marks and citations omitted).  The "law is unsettled" as to whether the same standards govern the use of force on prisoners and pretrial detainees, but it is clear that conduct that would violate the Eighth Amendment

15

rights of a prisoner would also run afoul of the Fourteenth Amendment protections accorded to a pretrial detainee. *Griffin,* 604 F.3d at 953. Under the Eighth Amendment standard, the "core judicial inquiry" in assessing the use of force against an inmate is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S. Ct. 995, 999 (1992); *see also Griffin,* 604 F.3d at 953-54 (applying this standard in a case involving a pretrial detainee). Factors to consider in this inquiry include "the extent of injury suffered by an inmate," as well as "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson,* 503 U.S. at 7, 112 S. Ct. at 999 (internal quotation marks and citation omitted).

Turning to the present motion, Defendants' challenge to Plaintiff's § 1983 claim of excessive force is cursory at best. Defendants first offer a two-sentence, *pro forma* statement of the pertinent legal principles. (Defendants' Motion, Br. in Support at 11.) This is followed by a single paragraph in which Defendants present an extremely abridged, cherry-picked summary of Plaintiff's deposition testimony, and then close with the conclusory assertion that "the use of force to bring Plaintiff into compliance was both necessary and justified." (*Id.*) This terse discussion is unaccompanied by any exposition of the more precise legal principles and considerations that govern the use of force against inmates, nor do Defendants cite any cases addressing analogous facts. In short,

16

Defendants invite the Court to conclude that since Plaintiff "fail[ed] to follow verbal commands" and, in their view, "actively resisted attempts to restrain her," (*id.*), any force used against her in the course of the incidents giving rise to this suit was lawful and justified.

This abbreviated challenge, however, is belied by the evidentiary record. Plaintiff's complaints of excessive force rest largely on two incidents, both on the second day of her detention at the Genesee County Jail. In the first, which occurred at around noon on July 13, 2007, Plaintiff was placed in a restraint chair after she reportedly disregarded commands to cease her disruptive behavior, which included yelling out of her isolation cell, banging on the cell door, and covering a safety camera in the cell. (*See* Defendants' Motion, Ex. 3, Incident Report.) Yet, while this behavior might have warranted the use of a restraint chair, Defendants fail to address Plaintiff's challenge to the ***manner*** in which this process was carried out. In particular, Plaintiff testified that one of the Defendant deputies grabbed her by the throat or neck and slammed her into a wall, and that a number of deputies then grabbed her and threw her into the chair. (*See* Plaintiff's 3/25/2010 Dep. at 134, 137; Plaintiff's 3/31/2010 Dep. at 134, 142-44.) Likewise, although Defendants point to Plaintiff's testimony that she "resisted a little bit" as she was strapped into the restraint chair, (Plaintiff's 3/31/2010 Dep. at 21), she denied flailing or thrashing her arms and legs around during this process, (*see id.* at 20-21), as claimed in the incident report prepared by Defendant Schmieder, (*see* Defendants' Motion, Ex. 3). In any event, any resistance as Plaintiff was being strapped into the chair

17

could not serve to justify the force used against her ***before*** the Defendant officers began this process of strapping Plaintiff into the restraint chair.[8]

Defendants have even less to say about the second incident cited in support of Plaintiff's claim of excessive force. At around 8:30 p.m. on July 13, 2007, Plaintiff was again engaged in uncooperative and disruptive behavior, causing her to be placed in a restraint bed for a second time. Once again, even accepting Defendants' contention that the use of a restraint bed was warranted in light of Plaintiff's "fail[ure] to follow verbal commands," (Defendants' Motion, Br. in Support at 11),[9] Defendants utterly fail to address Plaintiff's complaints (and supporting testimony) as to the degree of force used in this process of restraining her. Although the Defendant officers have stated in their incident reports that force was applied after Plaintiff disregarded their commands to lie down on the bed and instead turned on her side, attempted to get up, and resisted the officers' efforts by pushing and kicking, (*see* Defendants' Motion, Ex. 5, Incident Reports), Plaintiff has testified that a group of "[a]t least six" officers "call[ed] me names" and "physically pick[ed] me up and forc[ed] me onto the bed," during which time she was simply "asking [the officers] why they were doing this" and requesting that they

_____

[8]As Defendants note, the record reveals that Plaintiff worked her right arm free after she was strapped into the restraint chair. (*See* Defendants' Motion, Ex. 3, Incident Report; *see also* Plaintiff's 3/25/2010 Dep. at 137-38.) Again, however, while this could serve as justification for the ensuing decision to move Plaintiff to a restraint bed, it has no bearing on the lawfulness of the force that had already been used in the process of putting Plaintiff into the restraint chair.

[9]Notably, in the portion of Plaintiff's deposition that Defendants cite in support of this proposition, Plaintiff is referring to an earlier incident, and not the incident that occurred in the evening of July 13. (*See* Plaintiff's 3/25/2010 Dep. at 131.)

18

"please stop pulling on" her dislocated left arm, (Plaintiff's 3/31/2010 Dep. at 114-17).

Plaintiff further testified that "every time I lifted my head to ask what was going on," she

felt an officer's knee push down against her back and shoulder, causing her head to slam

against the bed. (*Id.* at 118-19.) In addition, Plaintiff testified that as the officers pinned

her face down on the bed, one of the officers administered OC spray directly into her eye

from a distance of only 2 1/2 inches, without any warning that this spray would be used if

she did not settle down. (*Id.* at 116-19.) She was then left face down on the bed with her

face lying "in a pool of Mace," which caused Plaintiff to inhale the spray into her mouth

and nose. (*Id.* at 120.)

Viewing this record in a light most favorable to Plaintiff, the degree of force used

by the Defendant officers could be deemed under the case law to have exceeded the

legitimate purposes of maintaining prison discipline and keeping order, and to have

instead amounted to cruel and unusual punishment in violation of the Eighth

Amendment.[10] In *United States v. Budd,* 496 F.3d 517, 531-32 (6th Cir. 2007), for

example, the Sixth Circuit found that the defendant officer violated an inmate's Eighth

Amendment rights by slamming the inmate's head against the steel frame of a window.

Although the inmate was mouthing off at the time, there was no evidence that he was

engaging in physically threatening conduct, and the court reasoned that "'being

---

[10]As noted earlier, while Plaintiff's rights as a pretrial detainee flow from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, it is clear that a use of force that violates the standards of the Eighth Amendment would also suffice to establish a Fourteenth Amendment claim brought by a pretrial detainee. *See Griffin,* 604 F.3d at 953.

obnoxious' does not justify the use of force." *Budd,* 496 F.3d at 531-32.  The court also

held that the defendant officer committed a further Eighth Amendment violation by

stepping on the inmate's back with both feet after the inmate had been taken to the

ground, was compliant, and "did not verbally or physically threaten anyone."  496 F.3d at

532.

Similarly, in *United States v. Bunke,* No. 09-3311, 412 F. App'x 760, 765-66 (6th

Cir. Jan. 19, 2011), the court found that an inmate had been subjected to cruel and

unusual punishment in violation of the Eighth Amendment, where the defendant officer

responded to the inmate's "possibly obnoxious statements" by throwing him face down

on the floor with his arms underneath him, and where the defendant officer then delivered

"several hard blows to the [inmate's] right side, [his] head, or both" as two officers sat on

his legs and four others "tried to pry his arms out from under him" in order to handcuff

him.  In so ruling, the court reasoned that the inmate's "resistance to being handcuffed did

not constitute a threatening situation under the circumstances," in light of witness

testimony that the inmate was "pinned to the floor by six guards" and thus "posed no

threat."  *Bunke,* 412 F. App'x at 766; *see also Bailey v. Golladay,* No. 09-2411, 421 F.

App'x 579, 583 (6th Cir. May 3, 2011) (finding that the plaintiff prison inmate had raised

issues of fact as to his Eighth Amendment claim, in light of the evidence that the inmate's

head was repeatedly banged against the steel entrance to a segregation unit "after he was

restrained and had become cooperative"); *Hardy v. Vieta,* No. 05-1024, 174 F. App'x

923, 924-25 (6th Cir. Apr. 4, 2006) (reversing the dismissal of a prisoner's Eighth

20

Amendment claim, where his allegations indicated that the defendant officer was not pursuing a "prison security measure" when he "purposefully and intentionally push[ed] a steel door" on the prisoner and "smashed him between the steel door and a brick wall").

Likewise, in this case, a trier of fact could reasonably conclude from the record that Plaintiff's verbal disruptions, acts of disobedience, and modest resistance did not justify the degree of force used against her, where her testimony indicates that she was not actively resisting the Defendant officers and did not pose any threat at the time of the incidents giving rise to her claims. As to the first of these incidents, the record could be viewed as establishing that one or more of the Defendant officers used wholly gratuitous and unnecessary force by grabbing Plaintiff by the neck or throat, slamming her into a wall, and then forcefully throwing her into a restraint chair. Regarding the incident later that day, Plaintiff's testimony, if credited by the trier of fact, would support the conclusion that she was offering little or no physical resistance as six officers called her offensive names, picked her up, and forced her into the restraint bed, and that her head was repeatedly slammed against the bed each time she sought to lift it and ask what was going on. This testimony could further be viewed as indicating that Plaintiff was pinned down to the bed by several officers and no longer in a position to resist when one of the Defendant officers administered OC spray directly into her eye.[11] In light of this record,

---

[11]To be sure, Defendants note that the record does not appear to support Plaintiff's assertion in her response brief that she was already strapped into the restraint bed at the time the OC spray was administered. Nonetheless, the case law indicates that the use of pepper spray may constitute excessive force once an individual is secured and poses no threat to the officers or others in the area. *See Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir. 2004).

the Court finds that issues of fact remain as to whether Plaintiff was subjected to

excessive force in violation of her Fourteenth Amendment rights as a pretrial detainee.[12]

Nonetheless, Defendants suggest that Plaintiff cannot pursue her claims of

excessive force because there purportedly is "no evidence that any of the named

Defendants were present" during the incidents giving rise to these claims.  (Defendants'

Reply Br. at 3.)  This argument, however, overlooks the incident reports prepared by the

Defendant officers themselves.  Regarding Plaintiff's placement in a restraint chair at

around noon on July 13, 2007, the pertinent report reveals that Deputy Baylock and

Sergeant Schmieder were present during this incident.  (*See* Defendants' Motion, Ex. 3,

Incident Report.)  As to Plaintiff's placement in a restraint bed later that evening, the

reports of this incident show that Deputy Nelson, Deputy Gatica, Deputy Haskins,

Sergeant Ignash, and Sergeant Schmieder all participated in this effort.  (*See* Defendants'

Motion, Ex. 5, Incident Reports.)

Under this record, Plaintiff's claims of excessive force may go forward against the

---

[12]Apart from contending that Plaintiff has failed as a matter of law to establish a violation of her Fourteenth Amendment rights, Defendants suggest in the alternative that they are entitled to qualified immunity against liability for any violation that might have occurred.  Here again, however, Defendants' argument is so perfunctory as to amount to a waiver.  Following a boilerplate statement of the law of qualified immunity, Defendants offer a two-sentence argument, without discussion of the facts or analysis of the pertinent case law, (i) that "their conduct did not violate Plaintiff's rights under the 14th Amendment," and (ii) that, even if it did, "the law did not put these Defendants on notice that their conduct in these circumstances violated a clearly established right."  (Defendants' Motion, Br. in Support at 10.)  The Court has now determined that questions of fact remain as to the first of these contentions.  In so ruling, the Court has drawn upon Supreme Court and Sixth Circuit precedents that set forth the clearly established law governing the use of force against inmates and pretrial detainees.  Accordingly, the Court rejects Defendants' cursory appeal to qualified immunity.

Defendant officers named in the incident reports, despite Plaintiff's admitted inability to identify precisely which Defendant officer engaged in which particular use of force. The Sixth Circuit addressed a similar situation in *Cole v. City of Dearborn,* No. 10-2392, 448 F. App'x 571, 573 (6th Cir. Nov. 28, 2011), in which the two plaintiffs alleged that they were subjected to excessive force as they lay face down on the ground. In light of the plaintiffs' allegations that both of the two defendant police officers on the scene had used excessive force, the court found a sufficient basis for concluding that each of these officers was "personally involved in the alleged excessive force," despite the plaintiffs' inability to "identify which officer engaged in what behavior." *Cole,* 448 F. App'x at 576-77. Alternatively, even if all of the allegedly unlawful force could be attributed to only one of the two defendant officers, the court found that the claim against the remaining officer could go forward, where this officer "had reason to know that force was being applied, and had the opportunity and means to stop his partner from engaging in further force." *Cole,* 448 F. App'x at 577; *see also Binay,* 601 F.3d at 650-51 (finding issues of fact as to whether the two individual defendant police officers were personally involved in the use of excessive force against the plaintiffs, observing that "the fact that [the officers] wore masks during the raid made it exceedingly difficult for Plaintiffs to identify with precision which officers engaged in which conduct").

Likewise, in this case, the record establishes that six of the Defendant officers were present at the incidents giving rise to Plaintiff's claims of excessive force. This record also would permit the conclusion that these six officers were involved, at least to

some degree, in the infliction of force identified in Plaintiff's deposition testimony. In light of this evidence, the Court finds that issues of fact remain as to whether these six Defendants either actively participated in the excessive force complained of by Plaintiff or, at a minimum, had "the opportunity and the means to prevent the harm," *Smoak,* 460 F.3d at 784 (internal quotation marks and citation omitted), that allegedly was being inflicted by their fellow officers.

**D.     The Substantive Due Process Claim Asserted in Count II of Plaintiff's Complaint Does Not Provide a Separate Basis for Recovery, But Instead Is Duplicative of the Fourteenth Amendment Claim Asserted in Count I.**

Count II of Plaintiff's first amended complaint, like Count I, rests upon the Due Process Clause of the Fourteenth Amendment. (*See* First Amended Complaint at ¶¶ 36, 47.) Yet, while Count I focuses on the Defendant officers' alleged use of excessive force, (*see id.* at ¶¶ 36-37), Count II invokes more general notions of substantive due process and features a much broader panoply of Fourteenth Amendment protections that the Defendant officers allegedly abridged, including Plaintiff's rights to freedom from "deprivation of bodily security and integrity," freedom from "conscience-shocking behavior," freedom from deprivation of privacy, privileges and immunities, and freedom from excessive force, (*see id.* at ¶ 47). In their present motion, Defendants seek the dismissal of the Fourteenth Amendment claim asserted in Count II, arguing that this claim is largely duplicative of the claim asserted in Count I, and that it otherwise rests upon the alleged abridgement of rights not afforded to pretrial detainees. The Court agrees.

In her response to Defendants' motion, Plaintiff does not take issue with

24

Defendants' contention that many of the Fourteenth Amendment rights and protections cited in Count II of her complaint — *e.g.,* the right of privacy, as well as the protections against deprivations of (unspecified) privileges and immunities — do not exist in a custodial setting. Rather, Plaintiff contests only the assertion that her Count II substantive due process claim is duplicative of the Fourteenth Amendment claim asserted in Count I of her complaint. In particular, Plaintiff observes that the Fourteenth Amendment has been interpreted as incorporating a substantive protection against egregious official conduct that "shocks the conscience," *see, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S. Ct. 1708, 1716-17 (1998), and she evidently suggests that her Fourteenth Amendment claim in Count II is meant to encompass all of the instances of allegedly conscience-shocking conduct by the Defendant officers that do not fit within the rubric of excessive force.

Under the facts and circumstances presented here, however, the Court does not view Plaintiff's appeal to the "shocks the conscience" standard as providing an additional avenue of recovery, beyond the relief Plaintiff may seek under Count I of her complaint. While this standard serves as the overarching measure for conduct that runs afoul of the substantive component of the Fourteenth Amendment's Due Process Clause, *see Lewis,* 523 U.S. at 846, 118 S. Ct. at 1717, the courts have adopted more particularized tests for evaluating the activities of government officials in specific settings. In this case, for example, Plaintiff's claims arising from the use of force by the Defendant officers are governed by a standard that calls for inquiry whether the degree of force used on a pretrial

25

detainee was so excessive as to "amount[] to punishment." *Griffin,* 604 F.3d at 953 (internal quotation marks and citation omitted). In contrast, to the extent Plaintiff alleges that one or more of the Defendant officers failed to ensure that she was provided with adequate treatment for a medical condition, such a claim entails a showing that Defendants "acted with deliberate indifference to [Plaintiff's] serious medical needs." *Watkins v. City of Battle Creek,* 273 F.3d 682, 685-86 (6th Cir. 2001).

Against this legal backdrop, Plaintiff has pointed to very little in the record that would trigger scrutiny under the generalized "shocks the conscience" standard, and nothing that could actually satisfy this standard. To the extent Plaintiff appeals to this standard as governing her claim that she was strapped too tightly into the restraint chair, (*see* Plaintiff's Response Br. at 15), the Court believes that this complaint is more properly analyzed under the excessive force standard addressed earlier, and is therefore encompassed within the claim asserted in Count I. Next, to the extent Plaintiff complains that she "constantly begged for medical attention" during her detention at the Genesee County Jail but these pleas were ignored, (*id.*), these allegations would not trigger a generalized "shocks the conscience" inquiry, but instead are governed by the "deliberate indifference" standard, *see Watkins,* 273 F.3d at 686. Yet, beyond her cursory assertion that her requests for medical attention were not heeded, Plaintiff has made no effort to identify evidence in the record from which she could make the requisite showing of deliberate indifference. Most notably, Plaintiff has not cited any evidence that her medical needs were sufficiently serious to satisfy the objective prong of the "deliberate

26

indifference" standard.  *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977

(1994) (internal quotations and citation omitted); *see also Comstock v. McCrary,* 273

F.3d 693, 702-03 (6th Cir. 2001).

This leaves only Plaintiff's complaints that she was forced to wait for

approximately twenty minutes before she was taken to a shower and allowed to rinse the

OC spray from her eyes, and that much of her limited opportunity for showering was

wasted when a female deputy elected to "play[] a game of hot and cold" with her.

(Plaintiff's Response Br. at 15.)  To the extent that Plaintiff cites this incident as an

additional example of a request for medical attention that went unheeded, Plaintiff again

has failed to show (or even argue) that her medical needs were sufficiently serious to

satisfy the "deliberate indifference" standard.  As for the remaining aspects of this

incident, while the Court neither condones the alleged conduct of the female deputy nor

minimizes the discomfort and humiliation attendant to Plaintiff's interaction with this

deputy, Plaintiff has made no effort to show that this conduct was such an egregious

abuse of power as to meet the demanding "shocks the conscience" standard.  Certainly,

Plaintiff has not directed the Court's attention to any case law in which analogous

conduct has been found to shock the conscience.  Accordingly, the Court concludes that

the record in this case fails as a matter of law to support a recovery under the more

generalized theory of substantive due process advanced in Count II of the complaint, and

that each of Plaintiff's viable Fourteenth Amendment claims in this case is more properly

pursued and analyzed under the excessive force theory asserted in Count I.

27

**E.    Plaintiff Has Failed to Identify a Basis for Holding the Defendant County
Liable Under 42 U.S.C. § 1983 for Any Violation of Her Fourteenth
Amendment Rights by the Individual Defendant Officers.**

The third and final federal claim asserted by Plaintiff in this case is set forth in

Count V of the first amended complaint.  This count, like Counts I and II, arises under 42

U.S.C. § 1983, but Count V seeks to hold Defendant Genesee County liable for the

federal constitutional violations allegedly suffered by Plaintiff while she was detained at

the Genesee County Jail.  Through their present motion, Defendants argue that Plaintiff

has failed as a matter of law to produce evidence that would support the imposition of

liability on the Defendant County under § 1983.  The Court agrees.

As both sides recognize, Defendant Genesee County "cannot be held liable under §

1983 for an injury inflicted solely by its employees or agents."  *Gregory v. Shelby

County,* 220 F.3d 433, 441 (6th Cir. 2000) (citing *Monell v. Department of Social Servs.,*

436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)).  Instead, "[f]or liability to attach, there

must be execution of a government's policy or custom which results in a constitutional

tort."  *Gregory,* 220 F.3d at 441.  Moreover, Plaintiff must establish that "through its

deliberate conduct, the [County] was the 'moving force' behind" the violation of her

constitutional rights — that is, she "must show that the [County's] action was taken with

the requisite degree of culpability and must demonstrate a direct causal link between the

[County's] action and the deprivation of federal rights."  *Gregory,* 220 F.3d at 442

(quoting *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S.

Ct. 1382, 1389 (1997)).

28

In this case, Plaintiff seeks to establish the requisite custom or policy by asserting that the individual Defendant officers were inadequately trained and supervised. As to the first of these contentions, the Supreme Court has recognized that a local governmental unit, such as the Defendant County here, may be subject to § 1983 liability under a "failure to train" theory. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989). The Court further emphasized, however, that this theory can succeed "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *City of Canton,* 489 U.S. at 389, 109 S. Ct. at 1205. This standard, in turn, can be met by showing that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S. Ct. at 1205. Finally, the Court stated that "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." 489 U.S. at 391, 109 S. Ct. at 1206.

The record in this case not only fails to support Plaintiff's claim of inadequate training, but largely refutes it. Although Plaintiff points to the purported testimony of "numerous" individual Defendants that "it had been years since they received any use of force training," (Plaintiff's Response Br. at 18), the cited portions of the record reveal that this assertion is somewhat misleading. Specifically, of the four Defendant officers

29

identified by Plaintiff as giving such testimony, one (Defendant Gatica) could not recall

the last time she had received training regarding excessive force, but she estimated that it

was a "[c]ouple years ago." (Plaintiff's Response, Ex. F, Gatica Dep. at 9.) Similarly,

Defendant Haskins testified that he received use of force training in 2005, (Plaintiff's

Response, Ex. I, Haskins Dep. at 13-14), roughly two years before the incidents in July of

2007 giving rise to Plaintiff's claims. Still another of these four Defendants, Sergeant

Schmieder, testified that Genesee County officers were "constantly training" regarding

County policies and procedures, and he stated more specifically that the subject of use of

force was addressed "approximately three times a year." (Plaintiff's Response, Ex. H,

Schmieder Dep. at 12-13.)[13]

The picture that emerges from this record, then, is that the pertinent Defendant

officers were, in fact, trained in the appropriate use of force. To the extent Plaintiff

means to suggest, at least implicitly, that this training could or should have been

conducted more frequently, she has not even attempted to identify any basis upon which a

trier of fact could conclude that the need for more frequent training was obvious, or that

the existing training regimen was likely to result in the unlawful use of force against

detainees. *See Miller v. Calhoun County,* 408 F.3d 803, 816 (6th Cir. 2005) ("Mere

---

[13]To be sure, the fourth Defendant officer whose testimony Plaintiff cites in support of her "failure to train" theory, Defendant Lynch, stated that he had last received use of force training in 2000. (*See* Plaintiff's Response, Ex. E, Lynch Dep. at 17.) As discussed earlier, however, there is no evidence of Defendant Lynch's involvement in any of the incidents giving rise to Plaintiff's claims in this case. Consequently, any violations of Plaintiff's constitutional rights could not be attributed to deficiencies in Defendant Lynch's training.

allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.").  Most notably, Plaintiff has not produced evidence of any prior incidents that might have alerted the Defendant County to the need to reassess its program for training its officers in the proper use of force.  *See Plinton v. County of Summit,* 540 F.3d 459, 464 (6th Cir. 2008) (citing evidence of prior instances of unconstitutional conduct as the ordinary means by which a plaintiff may satisfy the deliberate indifference standard for municipal liability).

Likewise, while Plaintiff suggests that the Defendant officers received inadequate training in the proper use of restraint chairs and beds, she has failed to identify any basis in the record for drawing a causal connection between any such deficiency in training and a violation of her constitutional rights as a pretrial detainee.  Again, Plaintiff somewhat overstates the record by asserting that two of the Defendant officers "testified that they ha[d] not received training regarding restraint beds/chairs or that it ha[d] been years since such training."  (Plaintiff's Response Br. at 19.)  In fact, one of the officers, Defendant Gatica, testified that she received training on restraint chairs in 2002 and 2005, as well as occasional updates.  (Plaintiff's Response, Ex. F, Gatica Dep. at 37-38.)  The second officer, Defendant Baylock, testified that he was trained by his fellow deputies in the use of a restraint bed and restraint chair, although he did not specify (and was not asked) when this training had occurred.  (Plaintiff's Response, Ex. G, Baylock Dep. at 18-19.)  Under this record, Plaintiff's challenge to the Defendant officers' training in the use of restraint chairs and beds seemingly must rest upon the notion that this training should

31

have been conducted more frequently.  Yet, she once again has not supplied (or even suggested) any basis upon which a trier of fact could conclude that this purported deficiency was obvious or likely to result in violations of the constitutional rights of detainees.  Accordingly, Plaintiff has failed to identify any grounds in the record for holding the Defendant County liable under a "failure to train" theory.

Plaintiff's second theory of County liability is that the Defendant officers were inadequately supervised, but this claim, too, is undermined — and, in fact, defeated — by the evidentiary record.  In support of her assertion that the Defendant County has "fail[ed] to review its police officer[s'] performance on the job," thereby "allow[ing] its officers to continuously violate citizens' constitutional rights," (Plaintiff's Response Br. at 19), Plaintiff cites the deposition testimony of two Defendant officers.  One of these officers, Sergeant Schmieder, testified that written performance reviews were not done on a "consistent basis," and that an officer might perhaps go a couple of years without one. (Plaintiff's Response, Ex. H, Schmieder Dep. at 12.)  The second officer, Defendant Lynch, recalled that he had received his most recent performance evaluation "maybe six years ago."  (Plaintiff's Response, Ex. E, Lynch Dep. at 10.)[14]  In contrast, Defendants' reply brief is accompanied by a chart revealing that each of the six Defendant officers who interacted with Plaintiff during her July 2007 detention at the Genesee County Jail

---

[14]As noted above, summary judgment has been awarded in favor of Defendant Lynch on the claims asserted against him, in light of the absence of evidence that he had any contact with Plaintiff during her detention at the Genesee County Jail.  Thus, any purported shortfall in the Defendant County's supervision of Defendant Lynch could not have contributed to Plaintiff's alleged constitutional injuries.

— *i.e.,* Defendants Gatica, Baylock, Schmeider, Haskins, Ignash, and Nelson — received written performance appraisals within an 18-month period prior to the incidents giving rise to this case.  (*See* Defendants' Reply, Ex. B.)

Under this record, Plaintiff cannot show that the Defendant County's practice of conducting performance reviews of its officers was so deficient as to evidence the County's deliberate indifference to the violation of Plaintiff's constitutional rights as a pretrial detainee.  In the case cited by Plaintiff in support of her "failure to supervise" theory, the record was "devoid of any performance evaluations" of one of the defendant officers over his 32 years of service, despite complaints about this officer's performance by citizens and fellow officers.  *Kammeyer v. City of Sharonville,* No. 01-00649, 2006 WL 1133241, at *11 (S.D. Ohio Apr. 26, 2006).  Here, in contrast, the six Defendant officers who were involved in Plaintiff's detention had each received a written performance review within 18 months prior to this detention.  Moreover, despite her wholly unsupported and irresponsible charge of "continuous[]" constitutional violations committed by the Defendant County's officers, Plaintiff has utterly failed to identify any evidentiary basis for concluding that a more frequent or otherwise different practice of conducting performance reviews would have uncovered misconduct by any of the pertinent six officers — much less a form of misconduct similar to that claimed by Plaintiff here — such that the Defendant County would have been on notice of the need for additional or closer supervision.  *See Marcilis v. Redford Township,* 757 F. Supp.2d 663, 682 (E.D. Mich. 2010) (distinguishing *Kammeyer* on this ground); *Garigiola v. City*

*of Brighton,* No. 08-13763, 2010 WL 104605, at *6 (E.D. Mich. Jan. 7, 2010) (same).

Accordingly, the Court readily concludes that Plaintiff's "failure to supervise" theory of

liability against the Defendant County, like her "failure to train" theory, lacks support in

the evidentiary record.

**F.      Issues of Fact Remain as to Plaintiff's State-Law Claims Against the Six Defendant Officers Involved in Her July 2007 Detention at the Genesee County Jail.**

Finally, in Counts III and IV of her first amended complaint, Plaintiff has asserted

state-law claims of assault and battery and gross negligence against the twelve individual

officers named as Defendants.  As discussed earlier, the claims against six of these

Defendant officers — *i.e.,* Defendants Coon, Lynch, Yorke, Guest, Hunt, and Proby —

cannot go forward, in light of the absence of evidence of their involvement in the

incidents giving rise to this case.  As to the remaining six officers, Defendants argue in

the present motion that Plaintiff's state-law claims against these officers are both legally

deficient and factually unsupported.  The Court disagrees, on much the same grounds

cited above in the Court's analysis of Plaintiff's federal § 1983 claims against these six

officers.

First, as to Plaintiff's state-law claim of assault and battery, Defendants contend

that the record is devoid of evidence that the Defendant officers acted with the requisite

intent to harm Plaintiff, and that this record instead discloses that the officers used force

only in a lawful effort to overcome Plaintiff's resistance as the officers attempted to

restrain her.  Yet, as discussed earlier, Plaintiff has identified genuine issues of fact as to

34

whether she had ceased any active resistance to the Defendant officers and no longer posed any threat to prison security or discipline at the time of the incidents giving rise to her claims.  It follows that Plaintiff's state-law claim of assault and battery cannot be resolved as a matter of law under the present record, but instead must be left for the trier of fact to decide.

Next, Defendants argue that Plaintiff's claim of gross negligence impermissibly rests upon alleged conduct that is not merely grossly negligent, but instead has been characterized as intentional in Plaintiff's complaint and in her deposition testimony.  As Plaintiff observes, however, the Sixth Circuit has permitted plaintiffs to simultaneously pursue a claim of excessive force under § 1983 and a gross negligence claim under Michigan law, noting that the latter claim may go forward even if it is determined that the defendant police officers did not act intentionally, but only recklessly.  *See Kostrzewa v. City of Troy,* 247 F.3d 633, 642-43 (6th Cir. 2001).  Likewise, in this case, if Plaintiff is unable to persuade the trier of fact that one or more of the Defendant officers violated her federal constitutional rights through the intentional infliction of excessive force amounting to punishment, this would not foreclose the possibility that she could establish conduct amounting to gross negligence under Michigan law.  Accordingly, Plaintiff may continue to pursue her state-law claim of gross negligence against the six Defendant officers who participated in the alleged incidents giving rise to this case.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

35

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' June 1, 2010 motion for summary judgment (docket #115) is GRANTED IN PART, as to Plaintiff's claims against Defendants Genesee County, Coon, Lynch, Yorke, Guest, Hunt, and Proby, and as to the federal substantive due process claim asserted in Count II of Plaintiff's first amended complaint.  In all other respects, Defendants' motion for summary judgment is DENIED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  June 21, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 21, 2012, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager